UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

GARY WILLIAMS,                    :
                                  :
          Plaintiff               :     No. 1:12-CV-02274
                                  :
     vs.                          :     (Judge Kane)
                                  :
LACKAWANNA COUNTY PRISON,         :
et al.,                           :
                                  :
          Defendants              :

MEMORANDUM

I.   Background

          This is a pro se action brought by Plaintiff, Gary

Williams, an inmate formerly incarcerated at the Lackawanna County

Prison in Scranton, Pennsylvania,[1] pursuant to 42 U.S.C. § 1983.

This action is proceeding on the basis of two documents, referred

to as Plaintiff's "standing complaint": the original complaint

(Doc. No. 1) and an amended complaint (Doc. No. 47) accepted by

the Court by order of July 14, 2014. (Doc. No. 54.)  On August 5,

2014, Plaintiff filed a document entitled "Motion to Amend

Corrected Typos Within the Legal Section of Complaint." (Doc. No.

64.)  In that motion Plaintiff requested that the reference to the

Eighth Amendment in the legal claims section be amended to the

_____

* This amended memorandum replaces the Court's previous
memorandum, docketed on April 8, 2016 (Doc. No. 99.), to change
"Smart v. Villar, 547 F.2d 112, 113 (10th Cir. 1976), cert.
denied, 450 U.S. 1041 (1981)" on page 32 to "Smart v. Villar, 547
F.2d 112, 113 (10th Cir. 1976)."

1. 'According to the docket, Plaintiff is presently confined at
the State Correctional Institution, Camp Hill, Pennsylvania.

Fourteenth Amendment because he was not an inmate serving a sentence but a pretrial detainee.[2]  Id.  By order of August 6, 2014, the court granted that motion.  (Doc. No. 65.)

The Defendants named in the standing complaint are the Lackawanna County Prison, Warden Robert McMillan and Assistant Warden Betti (collectively referred to as the "Corrections Defendants") and Dr. Edward Zolaga, Certified Registered Nurse Practitioner Tony Iannuzzi, Licensed Practical Nurses Barbara Fox

---

2.  On August 28, 2012, a superseding indictment was filed in this court charging Edward McLaughlin and Gary Williams with, inter alia, conspiracy to murder McLaughlin's ex-wife.  United States v. McLaughlin, et al., No. 12-CR-179 (M.D.Pa. Aug. 28, 2012)(Doc. No. 30.) On April 23, 2013, a second superseding indictment was filed charging Williams with conspiracy to use interstate facilities in the commission of murder-for-hire in violation of 18 U.S.C. § 1958(Count 1); aiding and abetting using or carrying a firearm during and in relation to a crime of violence or possessing a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c)(Count 2); receiving a firearm with intent to commit an offense in violation of 18 U.S.C. § 924(b)(Count 3); felon in possession of firearm in violation of 18 U.S.C. § 922(g) and 18 U.S.C. 924(e)(1)(Count 4); and attempt to corruptly persuade a witness in violation of 18 U.S.C. § 1512(b)(1)(Count 5). (No. 12-cr-179, Doc. No. 81).  On March 13, 2013, the Honorable A. Richard Caputo ordered that McLaughlin and Williams be tried separately. (No. 12-cr-179, Doc. No. 69).  A jury trial with respect to Williams commenced on August 19, 2013. (No. 12-cr-179, Doc. No. 125.)  On August 22, 2013, the jury found Williams guilty of the five counts set forth in the second superseding indictment. (No. 12-cr-179, Doc. No. 127, 129, 131.)  On August 27, 2014, Judge Caputo sentenced Williams to a term of imprisonment of 420 months. (No. 12-cr-179, Doc. No. 257.) It appears that Williams was confined at the Lackawanna County Prison pending the completion of the federal criminal proceedings and unrelated state charges. (Doc. No. 44.)

and Terri Lamberti,[3] and Correctional Care, Inc. (collectively referred to as the "Medical Defendants").

The Plaintiff, in his standing complaint, alleges that he was denied adequate medical care for his fibromyalgia while confined at the Lackawanna County Prison. (Doc. Nos. 1, 47.) Plaintiff claims that when he was committed to the Lackawanna County Prison on May 30, 2012, he was under a doctor's care with orders to take Lyrica twice a day for his fibromyalgia. (Doc. No. 47, ¶¶ 4-13, 20.)  He contends that he advised Defendants of his condition, but he was denied treatment despite numerous grievances and attempts to resolve the matter. Id.  With respect to Defendant Lamberti, Plaintiff alleged that when he arrived at the Lackawanna County Prison he was medically evaluated by Defendant Lamberti and he advised her, inter alia, that he "was currently deemed disabled and under the care of Reddi-Care (sic) of Taylor Pa," suffered from fibromyalgia, and was prescribed Lyrica twice a day. Id. Plaintiff contends that Defendant Lamberti responded to the information he provided by stating, "we don't do Lyrica." Id. Plaintiff further alleges that he was assigned a lower bunk status rather than lower tier, even though he explained to Defendant Lamberti "that without Lyrica [he] would most certainly at time[s] have trouble sleeping, standing, sitting, walking, lifting, climbing steps, and maintaining [his] balance."  Id.

_____

3.  Plaintiff in the standing complaint refers to Defendant Lamberti as "Nurse Terry."

Plaintiff also sets forth a claim of retaliation against Defendant Iannuzzi. Id. Specifically, Plaintiff claims that after he complained about certain medications making him "violently ill,"[4] Defendant Iannuzzi retaliated against him by threatening to catheterize him if he complained of painful urination, placing him on high blood pressure medications knowing he had low blood pressure, taking a splint from him, and referring him to a psychiatrist. Id.

With respect to Defendant Fox, Plaintiff alleges that he explained his condition to her, and she "promised to see about getting [him] Lyrica after reviewing [his] medical records." Id. at 12.

Plaintiff does not allege any direct interaction with Defendant Zolaga but merely indicates that a counselor named Lori Davis told him that she sent an email to Defendant Zolaga explaining Plaintiff's medical condition and she could not understand why Defendant Zolaga did not respond. Id. at 11. Plaintiff sets forth no specific allegations against Defendant Correctional Care, Inc., other than (based on a liberal reading of the standing complaint) that Plaintiff's medical providers were employed by that company. (Doc. Nos. 1, 47.)

---

4.  The Court assumes that Plaintiff is contending that he filed a grievance with prison officials regarding this incident of becoming violently ill.

As for the Corrections Defendants - Warden McMillan and Assistant Warden Betti[5] - the only allegations leveled against them relate to the manner in which they responded to Plaintiff's grievances. Id.

As relief, Plaintiff requests the issuance of an injunction and compensatory and punitive damages.

Answers were filed by the Corrections Defendants and Medical Defendants to Plaintiff's standing complaint. (Doc. Nos. 14, 46, 57, 58.)  On October 30, 2014, the Corrections Defendants filed a motion for summary judgment and a brief in support thereof. (Doc. Nos. 72, 73.)  The Corrections Defendants also filed a statement of material facts in accordance with Local Rule 56.1 and evidentiary materials. (Doc. No. 74.)  On November 13, 2014, Plaintiff filed a brief in opposition. (Doc. No. 76.)  The Corrections Defendants elected not to file a reply brief.

On February 26, 2015, the Medical Defendants filed a motion for summary judgment and a brief in support thereof. (Doc. Nos. 81, 83.)  The Medical Defendants also filed a statement of material facts in accordance with Local Rule 56.1 and evidentiary materials. (Doc. Nos. 82, 84.)  On March 13, 2015, Plaintiff filed a brief in opposition (Doc. No. 87), an unsigned "Declaration In Opposition to Medical Defendant's (sic) Motion for Summary Judgment" (Doc. No. 85), and a so-called "Statement of Disputed

---

5.  In a separate order, the claims against Lackawanna County Prison were dismissed.

Factual Issues" (Doc. No. 86)  which does not respond to the
Medical Defendants' statement of material facts in accordance with
Local Rule 56.1 and is merely a statement by Plaintiff of what he
contends are the issues in the case.  The Medical Defendants
elected not to file a reply brief but did file, on March 25, 2015,
a response (Doc. No. 88) to Plaintiff's so-called "Statement of
Disputed Factual Issues."  For the reasons set forth below, the
court will grant summary judgment in favor of the Corrections
Defendants and Medical Defendants.

## II.   <u>Summary Judgment</u>

Federal Rule of Civil Procedure 56(a) requires the court
to render summary judgment "if the movant shows that there is no
genuine dispute as to any material fact and the movant is entitled
to judgment as a matter of law." Fed.R.Civ.P. 56(a).  "[T]his
standard provides that the mere existence of some alleged factual
dispute between the parties will not defeat an otherwise properly
supported motion for summary judgment; the requirement is that
there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty
Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (emphasis in original).

A disputed fact is "material" if proof of its existence
or nonexistence would affect the outcome of the case under
applicable substantive law. <u>Anderson</u>, 477 U.S. at 248; <u>Gray v.
York Newspapers, Inc.</u>, 957 F.2d 1070, 1078 (3d Cir. 1992).  An
issue of material fact is "genuine" if the evidence is such that a
reasonable jury could return a verdict for the nonmoving party.

<u>Anderson</u>, 477 U.S. at 257; <u>Brenner v. Local 514, United</u>

<u>Brotherhood of Carpenters and Joiners of America</u>, 927 F.2d 1283,

1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of

material fact, the court must view the facts and all reasonable

inferences in favor of the nonmoving party. <u>Moore v. Tartler</u>, 986

F.2d 682, 685 (3d Cir. 1993); <u>Clement v. Consolidated Rail</u>

<u>Corporation</u>, 963 F.2d 599, 600 (3d Cir. 1992); <u>White v.</u>

<u>Westinghouse Electric Company</u>, 862 F.2d 56, 59 (3d Cir. 1988).  In

order to avoid summary judgment, however, the nonmoving party may

not rest on the unsubstantiated allegations of his or her

pleadings.  When the party seeking summary judgment satisfies its

burden under Rule 56 of identifying evidence which demonstrates

the absence of a genuine issue of material fact, the nonmoving

party is required by Rule 56 to go beyond the pleadings with

affidavits, depositions, answers to interrogatories or the like in

order to demonstrate specific material facts which give rise to a

genuine issue.  <u>Celotex Corporation v. Catrett</u>, 477 U.S. 317, 324

(1986).  The party opposing the motion "must do more than simply

show that there is some metaphysical doubt as to the material

facts."  <u>Matsushita Electric Industrial Co. v. Zenith Radio</u>, 475

U.S. 574, 586 (1986).  When Rule 56 shifts the burden of

production to the nonmoving party, that party must produce

evidence to show the existence of every element essential to its

case which it bears the burden of proving at trial, for "a

complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323.  See Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992).

## III.    Statement of Facts

Local Rule 56.1 states in toto as follows:

A motion for summary judgment filed pursuant to Fed.R.Civ.P. 56, shall be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried.

The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required in the foregoing paragraph, as to which it is contended that there exists a genuine issue to be tried.

Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements.

All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

M.D. Pa. LR 56.1 (emphasis added).  A standard practice order was issued on November 15, 2012, which advised Plaintiff of the requirements of several Local Rules of Court, including Local Rule 56.1. (Doc. No. 4.)

As stated above on February 26, 2015, the Medical Defendants filed a statement of material facts in accordance with Local Rule 56.1 along with evidentiary materials. (Doc Nos. 82, 84.)  The Medical Defendants' statement consists of 107 numbered

8

paragraphs, and all of the paragraphs, except 6 reference parts of
the record, are based on Plaintiff's allegations.[6] Id.  Plaintiff
did not respond to that statement in accordance with Local Rule
56.1.  Consequently, the 107 paragraphs are deemed admitted.

The first 13 paragraphs of the Medical Defendants'
statement of material facts refer to court docket entries or
essentially mirror the allegations of Plaintiff's standing
complaint.

Paragraphs 14 through 25 of the Medical Defendants'
statement, under the heading "Medical Treatment Prior to 5/30/2012
Incarceration," and the evidentiary materials reveal that, on
August 23, 2011, Plaintiff was treated by Maureen C. Kozloski,
M.D., a specialist in Internal Medicine, at Redi-Care Medical
Center, Inc., a walk-in clinic located in Taylor, Pennsylvania.
(Doc. Nos. 82 at 4-5; 84-1 at 1-10; 84-2 at 1-2; 84-3 at 1-2.)  At
the appointment on August 23rd Plaintiff's blood pressure was
elevated (148/78)[7] and he complained of a painful pelvis and

---

6.  The six paragraphs which do not reference portions of the
record are either conclusions of law, or based on the court's
review of the evidentiary materials are amply supported by that
record.

7.  According to the Mayo Clinic website normal blood pressure is
below 120/80; prehypertension is 120-139/80-89; Stage 1
hypertension is 140-159/90-99; and Stage 2 hypertension is 160 or
higher/100 or higher. Blood presssure chart: What your reading
means, Mayo Clinic Staff, http://www.mayoclinic.org/diseases-
conditions/high-blood-pressure/in-depth/blood-pressure/ART-200509
82 (Last accessed March 4, 2016). Those with Stage 1 hypertension
need to adopt a healthy lifestyle and those with Stage 2 should
consult a physician about taking one or more medications. Id.
(continued...)

intermittent bilateral leg pain which was not[8] relieved with
Tylenol or Motrin. Id.  Plaintiff reported that he suffered from
the pain since a motor vehicle accident in 2008. Id.  Dr.
Kozloski's assessment was that Plaintiff suffered from chronic low
back pain, and he could not rule out somatization.[9] Id.  Dr.
Kozloski prescribed the narcotic-like pain medication tramadol
(brand name Ultram). Id.  On September 16 and November 11, 2011,
Plaintiff had follow-up appointments with Dr. Kozloski. Id.  At
the appointment on September 16th Plaintiff complained of neck,
shoulder, back, leg and ankle pain and complained that his pelvis
was "on fire" and that the tramadol did not give him any relief.
Id.  Dr. Kozloski noted diffuse musculoskeletal pain, neck spasms
and positive tender points in the lower back and the right and
left knees and ankles. Id.  Dr. Kozloski's assessment was that
Plaintiff suffered from fibromyalgia,[10] and she prescribed

---

7.  (...continued)
However, if the individual has other conditions, such as heart
disease, the individual "may need to treat [the] blood pressure
more aggressively." Id.

8.  The Medical Defendants interpreted the Redi-Care medical
record to say "relieved with Tylenol/Motrin."  The Court's review
of that medical record however reveals a barely legible notation
by Dr. Kozloski that may also be read to mean "no relief with
Tylenol/Motrin ("∅ relief")."

9.  Somatization is the tendency to experience and communicate
mental or psychological symptoms in the form of physical
symptoms.  See Dorland's Illustrated Medical Dictionary, 1734
(32nd Ed. 2012).

10.  "Fibromyalgia is a disorder characterized by widespread
musculoskeletal pain accompanied by fatigue, sleep, memory and
(continued...)

Case 1:12-cv-02274-YK-GS   Document 93   Filed 03/16/16   Page 11 of 40

Cymbalta (generic duloxetine), which is a selective serotonin and norepinephrine reuptake inhibitor prescribed for depression and anxiety disorders, as well as fibromyalgia.[11] Id.  At the follow-up appointment on November 11, 2011, Plaintiff's blood pressure was normal (110/70), and he reported that he was unable to obtain Cymbalta and that he was still having "diffuse burning, muscle pain." Id.  Dr. Kozloski noted positive tender points over the trapezius muscle, lower back and extremities. Id.  Her diagnosis remained the same, and she prescribed Cymbalta for fibromyalgia, even though she or a rheumatologist had not excluded other disorders as the cause of Plaintiff's pain, and Crestor for high cholesterol. Id.

------

10.  (...continued)
mood issues." Fibromyalgia, Definition,  Mayo Clinic staff, http://www.mayoclinic.org/diseases-conditions/fibromyalgia/basics /definition/con-20019243 (Last accessed April 15, 2015).  At one point fibromyalgia was only diagnosed if a patient had 11 out of 18 positive tender or trigger points. The trigger or tender point testing was actually developed only for research studies but medical professionals began to use it for diagnostic purposes. Presently, a diagnosis can be made if a patient has widespread pain for more than 3 months with no underlying medical condition that could cause the pain.  There is no blood test or objective criteria for such a diagnosis to be made.  However, some physicians still rely on the tender point examination and attempt to rule out other possible causes, including rheumatological and autoimmune disorders. Fibromyalgia, Tests and diagnosis,  Mayo Clinic staff, http://www.mayoclinic.org/diseases-conditions/ fibromyalgia/basics/tests-diagnosis/con-20019243 (Last accessed March 1, 2016).

11.  Cymbalta, Drugs.com, http://www.drugs.com/cymbalta.html (Last accessed March 1, 2016).

On December 21, 2011, Plaintiff had an appointment with Redi-Care Medical Center but was not examined by Dr. Kozloski but by a different medical professional.[12] Id.  Plaintiff's blood pressure was elevated (148/95), and he continued to complain of diffuse pain mostly in the arms, wrists, shoulders and low back. Id. It was reported that Plaintiff was unable to obtain Cymbalta because he had no authorization from his insurance company. Id. The individual examining Plaintiff observed full range of motion of Plaintiff's joints, no red or hot joints, and mild tenderness over the right, mid-cervical region. Id. It was further noted that Plaintiff had a history of cervical fusion in 1999. Id.  The diagnostic assessment was that Plaintiff suffered from fibromyalgia and tobacco abuse.  Id.  Plaintiff was smoking two packs of cigarettes per day. Id.  Plaintiff was provided with samples of Cymbalta and advised "to return to see Dr. Kozloski before the samples ran out." Id.

On February 1, 2012, Plaintiff had a follow-up appointment with Redi-Care Medical Center with a physician assistant. Id.  At that appointment Plaintiff's blood pressure was elevated (132/88), and Plaintiff complained of the following side effects from Cymbalta: blurriness of vision, dizziness, tremors

_____

12.  The Court cannot discern from the medical record the type or name of the medical professional.

12

and erectile dysfunction (ED).  He stated that those symptoms lessened after discontinuing Cy and mbalta.  Id.  Plaintiff complained of intermittent neck, elbow, knee, pelvic and low back pain, which was always worse at the end of the day or after activity.  Id.  The physician assistant observed that Plaintiff had full range of motion of the upper and lower extremities and back, and he had no redness or edema.  Id.  The assessment of the physician assistant was that Plaintiff suffered from fibromyalgia, and he gave Plaintiff samples of Lyrica[13] and referred Plaintiff for a rheumatology consultation.  Id.

On March 6, 2012, Plaintiff returned to Redi-Care Medical Center for a prescription refill and follow-up appointment.  Id.  Other than vital signs, including blood pressure which was slightly elevated (130/80), there are no objective findings noted in the medical record, and the diagnostic assessment is only partially legible.  Id.  Plaintiff was diagnosed with high cholesterol, erectile dysfunction, and apparently some type of urinary tract problem because Plaintiff was referred for a urology consultation.  Id.  Blood tests were ordered including a

---

13.  Lyrica, generic pregabalin, "is an anti-epileptic drug . . . used to control seizures and to treat fibromyalgia." Lyrica, Drugs.com, http://www.drugs.com/lyrica.html (Last accessed March 1, 2016).  A potential side effect of Lyrica is the patient may have thoughts of suicide.  Id.  Contraindications for taking Lyrica include a history of depression or suicide attempts and a history of drug or alcohol addiction.  Id.

complete metabolic panel, chemical profile, and a prostate-specific antigen (PSA) test. Id. Plaintiff's prescription for Lyrica was reviewed and apparently refilled.[14] Id.

On March 16, 2012, Plaintiff had a follow-up appointment with Dr. Kozloski at which Plaintiff's blood pressure was elevated (140/80) and he complained of musculoskeletal pain which he believed was related to his fibromyalgia. Id. Dr. Kozloski increased Plaintiff's dosage of Lyrica from 75 mg twice daily to 150 mg twice daily. Id.

On May 30, 2012, Plaintiff was treated in the emergency department of the Regional Hospital of Scranton for a fracture of the fourth metacarpal of his right hand. (Doc. No. 84-4, at 2-4.)

Paragraphs 26 through 103 of the Medical Defendants' statement, under the heading "Medical Treatment During Incarceration Commencing 5/30/2012," and the evidentiary materials reveal that, at time of intake at the Lackawanna County Prison, a "Medical History" form was completed indicating he was 44 years old and had a history which included taking Lyrica 300 mg for

---

14.  There is no indication in the medical records that Plaintiff's insurance company at any point authorized payment for Lyrica.  Based on statements of Plaintiff noted in the prison medical records, it appears that Plaintiff received all of his medication by way of samples provided to him by Redi-Care. (Doc. No. 84-11, at 2 ("[He] states takes meds and receives all samples from Redi-Care[.]"); Doc. No. 84-11, at 7 ("I was using samples.")).

fibromyalgia. (Doc Nos. 82 at 5-16; 84-5 at 2.)  Plaintiff denied
any physical disability or limitations, advised that he attempted
suicide in the past by taking an overdose of Valium, and reported
treatment at a mental institution in Rockland, New York, when he
was 19 years old. Id.  Plaintiff's mental status at intake was
noted to be alert and oriented to person, place and time. Id.

At the time of intake on May 30th, a "Medical History and
Screening" form was completed which noted a history of
fibromyalgia and Lyrica and Crestor as current medications, but
Plaintiff denied symptoms including obvious pain. (Doc. No. 84-6
at 2-3.) Plaintiff's blood pressure was elevated (142/85) and he
was observed to have a cast on his right wrist that he consumed 8-
10 drinks of alcoholic beverage per day and that he was a heroin
user. Id.  Plaintiff stated that his last use of alcohol and
heroin was on May 29, 2012. Id.

At intake on May 30th an "Intake Mental Health
Screening" form was also completed on behalf of Plaintiff. (Doc.
No. 84-7 at 2.) During that screening Plaintiff reported 4 or 5
inpatient rehabilitation commitments as well as a suicide attempt
where he overdosed on Valium. Id.  Plaintiff reported being
worried about major problems other than his legal situation and
acknowledged a history of psychiatric treatment and violent
behavior. Id.

At intake Plaintiff signed a "Notification of Medical Services" which instructed him as to how to sign up for sick call. (Doc. No. 84-8 at 2.)  The notification advised Plaintiff that he would see a nurse for sick call daily and be provided with treatment as necessary. Id.  It further advised him that if his complaints warranted treatment by a physician he would be examined by a physician "at the next doctor's line." Id.  Plaintiff was identified as an inmate requiring alcohol detoxification and scheduled to see "the next doctor line," provided a bottom bunk under 30 minute detox watch, designated for regular monitoring of vital signs and administered medications and vitamins, including Librium,[15] Thiamine (Vitamin B1), and Folic Acid (Vitamin B9). (Doc. Nos. 84-9 at 2; 84-10 at 2.)

A medical dispensary card maintained by medical personnel of Correctional Care, Inc., dated May 30, 2012, indicates that Plaintiff had a soft cast on his right wrist, reportedly because of a fracture sustained five or six weeks earlier. (Doc. No. 84-11 at 2.)  Plaintiff reported being seen at Redi-Care where he was provided with samples of medication,

---

15.  Librium, generic chlordiazepoxide, is used to treat "anxiety disordrs and withdrawal symptoms due to alcoholism. . . It may be used for other conditions as determined by [a physician]." Librium, Drugs.com, http://www.drugs.com /cdi/librium.html (Last accessed March 3, 2016). Librium can lower blood pressure. See Librium, Side Effects, WebMD, http://www.webmd.com/drugs/2/drug-5263/librium-oral/details/list-sideeffects (Last accessed March 4, 2016).

including Lyrica, and the cholesterol reducing medications Tricor
and Crestor. Id.  Plaintiff's right wrist was put in a splint and
wrapped with tape. Id.  Plaintiff signed an "Authorization for
Release of Patient Information" from Redi-Care on May 30, 2012.
(Doc. No. 84-12 at 2.)

       The medical dispensary card reveals that on May 31,
2012, at 7:15 a.m., Plaintiff was seen by Correctional Care
personnel, his blood pressure was 92/58,[16] and Plaintiff reported
no complaints; at 8:00 a.m. on May, 31, 2012, Plaintiff was seen
at his cell door, he reported that he was drinking and voiding,
and it was noted that alcohol detoxification monitoring would
continue; at 1:19 p.m. on May 31, 2012, it was noted that
Plaintiff's records from Redi-Care were received and reviewed and
it was questioned whether his complaints of diffuse muscle
discomfort were a side effect of his high cholesterol medication
Crestor, and because of that concern an order was placed to "hold
all medications for now and observe;" Plaintiff was seen again at
his cell door at approximately 4:00 p.m. on May 31, 2012, and
Plaintiff's blood pressure was 130/80, and he reported that he
felt good; Plaintiff continued on regular alcohol detox monitoring

---

16.  The Librium apparently was responsible for this reduction in
Plaintiff's blood pressure.

through at least June 4, 2012,[17] without reporting any complaints;
however, several times he refused to take his medications and
vitamins.  (Doc. No. 84-11 at 3-5.)

According to Plaintiff's "Medication Administration
Record", he was administered daily medications in June, 2012
including hydroclorothiazide,[18] lovastatin (brand name Mevacor)[19],
aspirin, and Lopressor (generic metoprolol tartrate).[20] (Doc. No.
84-13 at 2-16.)

On June 11, 2012, Plaintiff submitted a grievance form
in which he complained that he was suffering from pain due to
fibromyalgia, for which he needed medication, and on June 19,
2012, he submitted a second grievance in which he complained that
his hand was not healing properly, requested x-rays and medication
for pain, and inquired as to why he was being "refused"

---

17.  On June 1st Plaintiff's blood pressure was reported to be
118/64; on June 2nd 118/78 and 90/60; on June 3rd 124/78 and
110/70; and on June 4th 116/76 and 118/78.(Doc. No. 84-11, at 4-
6.)

18.  Hydrochlorothiazide (HCTZ)(brand name Microzide) is a
diuretic that "prevents your body from absorbing too much salt,
which can cause fluid retention." HCTZ, Drugs.com, http://
www.drugs.com/hctz.html (Last accessed March 3, 2016).  It is
used to treat edema and high blood pressure. Id.

19.  Lovastatin is used to treat patients who have high
cholesterol. Lovastatin, Drugs.com http://www.drugs.com/
cdi/lovastatin.html (Last accessed March 3, 2016).

20.  Lopressor is used to treat high blood pressure. Lopressor,
Drugs.com, http://www.drugs.com/cdi/lopressor.html (Last accessed
March 3, 2016).

medication. (Doc. No. 84-1 at 2-3.)  On June 19, 2012, in response to Plaintiff's grievances, Plaintiff was given an order restricting him from all recreation or work until further notice. (Doc. No. 84-11 at 6.)  Also, on June 19, 2012, an authorization for release of patient information signed by Plaintiff was faxed to Redi-Care, requesting release of all of Plaintiff's medial records from January 1, 2008 to present. (Doc. No. 84-12 at 3.)

On June 20, 2012, Dr. Zolaga responded to Plaintiff's grievance of June 19, 202, and advised, "you cannot simply 'request x-rays,'" and, "no one is refusing to give you medication you need." (Doc. No. 84-14 at 3.)

On June 20, 2012, Plaintiff was recommended to undergo a psychological consultation to help decrease stress which might worsen fibromyalgia. (Doc. No. 84-11 at 6.)  It was noted that Plaintiff's purported fibromyalgia would be approached "conservatively" because there was no evidence of a rheumatologic or serologic evaluation for other possible causes of his musculoskeletal complaints.[21] Id.  Based on a review of Plaintiff's records, the diagnosis of fibromyalgia was determined to be questionable. Id.

On June 20, 2012, a call was made to Redi-Care by medical personnel of Corrections Care, Inc., to identify the

---

21.  Fibromyalgia is a diagnosis based on the exclusion of any other possible causes.

rheumatologist to whom Plaintiff was referred, and a medical order issued to obtain the records of the rheumatologist[22] and Dr. Vrabec, who was referred to in the Redi-Care medical records as one of Plaintiff's physicians prior to his incarceration. Id. at 6-7.

On June 27, 2012, Plaintiff submitted a grievance in which he complained of pain in the hips, elbows, neck, shoulder, and requested to be placed on the list to see the doctor. (Doc. No. 84-14 at 4.) Plaintiff reported being under the care of physicians prior to his incarceration, but advised that he could not remember their names. Id.

On June 28, 2012, Plaintiff's vital signs were checked {blood pressure,[21] pulse and temperature), and he was given a physical examination. (Doc. No. 84-11 at 7-8.) Plaintiff reported that he had punched a wall in the first week of April 2012, which resulted in a fracture of the right hand. Id. Plaintiff further reported that he had been in pain for 18 years, in all of his joints at all times, and that samples of Lyrica had helped his symptoms. Id. The assessment of the examining physician was that

_____

22. In a document filed by Plaintiff, he admits he never was evaluated by a rheumatologist. (Doc. No. 85 at 2.)

21. On June 28th Plaintiff's blood pressure was 170/80. (Doc. No. 84-11 at 7.)

Plaintiff suffered from high blood pressure, high cholesterol,
degenerative joint disease and

osteoarthritis. (Doc. No. 84-11 at 8.)  The physician also noted
that Plaintiff was smoking 3 packs of cigarettes per day. Id.
Plaintiff was ordered Motrin and Tylenol for 14 days, his splint
was discontinued, he was ordered Inderal,[22] hydroclorothiazide,
Cardura,[23] Mevacor, and aspirin for 90 days, and his medical
records were requested from Regional Hospital relating to his
right hand. Id. at 7-8.

With respect to Plaintiff's June 11, 2012, grievance
regarding medication for his alleged fibromyalgia, on June 28,
2012, Dr. Zolaga responded by asking him to identify his
rheumatologist and that the medical department needed the records
of Dr. Vrabec, who was identified in the Redi-Care records as
Plaintiff's family doctor. (Doc. No. 84-14 at 2.)  Also, on June
28, 2012, Dr. Zolaga responded to Plaintiff's June 27, 2012,
grievance where he requested to be seen by a physician, by noting
that Plaintiff had been seen by a physician. (Doc. No. 84-14 at
4.)

---

22.  Inderal (generic propranolol) is a high blood pressure
medication. Inderal, Drugs.com, http://www.drugs.com/inderal.html
(Last accessed March 3, 2016).

23.  Cardura (generic doxazosin) is used to treat high blood
pressure and to improve urination in men with an enlarged
prostate. Cardura, Drugs.com, http://www.drugs.com/cardura.html
(Last accessed March 3, 2016).

On June 29, 2012, medical personnel of Corrections Care, Inc., after reviewing Plaintiff's medications discontinued Inderal and started Lopressor, and a notation was inserted in the dispensary card to "hold" Cardura and that both Motrin and Tylenol should be reordered. (Doc. No. 84-11 at 8-9.)

On June 29, 2012, a third Authorization for Release of Patient Information signed by Plaintiff was faxed to Redi-Care requesting release of all of Plaintiff's medical records. (Doc. No. 84-12 at 4.) Also, on June 29, 2012, an Authorization for Release of Patient Information signed by Plaintiff was faxed to Regional Hospital. Id. at 5.

In July, 2012, according to Plaintiff's Medication Administration Record maintained by Corrections Care, Inc., he was administered daily medications, including Motrin, Tylenol, hydroclorothiazide, Mevacor, Lopressor, Inderal, Cardura and Depakene. (Doc. No. 84-13 at 2-16.)

On July 3, 2012, Plaintiff's records from Regional Hospital relating to his right wrist were reviewed by medical personnel of Corrections Care, Inc., and Plaintiff was referred to Dr. Cronkey, an orthopedist, for a consultation. (Doc. No. 84-11 at 9.)   On July 5, 2012, a call was made to Dr. Cronkey's office, and Dr. Cronkey advised that he no longer performed surgery. Id. In light of that fact, Plaintiff was referred to Dr. Greg Thomas, for an orthopedic consultation. Id.

22

On July 12, 2012, Plaintiff was seen in medical in
response to a grievance, and was referred for a psychiatric
consultation. Id.  On July 14, 2012, Plaintiff was ordered
Depakene, a medication used to treat mood disorders, seizures, and
migraines as well as fibromyalgia, (Doc. Nos. 84-13 at 6; 84-15 at
2-3.)

On July 18, 2012, Plaintiff submitted a grievance in
which he (1) asked to see Dr. Zolaga, (2) complained of being
disabled prior to incarceration because of fibromyalgia,
(3) complained of pain in his hips and major joints and (4)
complained of having difficulty sitting and sleeping, and (5)
demanded that the medical stop referring him to a "shrink" for
fibromyalgia. (Doc. No. 84-14 at 5.)  On July 19, 2019, Plaintiff
submitted a grievance in which he complained that he was suffering
from fibromyalgia, advised that Lyrica helped with pain, and
demanded treatment within five days or he would "sue for
$30,000.00 per month." (Doc. No. 84-14 at 6.)  Plaintiff also
filed a second grievance on July 19, 2012, in which he stated that
Barbara Fox had advised him that Dr. Zolaga referred him for a
psychiatric consultation, but that he believed it to be a
"retailtory (sic) action from Nurse 'Tony.'" (Doc. No. 84-14 at
7.)

On July 21, 2012, Plaintiff refused sick call.  (Doc.
No. 84-11 at 10.)  Dr. Zolaga responded to Plaintiff's July 18,

2012, grievance by noting that Plaintiff refused treatment. (Doc. No. 84-14 at 5.)

On July 30, 2012, Plaintiff authored a grievance in which he requested to be seen by Dr. Zolaga for fibromyalgia treatment. (Doc. No. 84-14 at 8.)  On August 8, 2012, Plaintiff refused sick call. (Doc. No. 84-11 at 10.)  On the same date, Dr. Zolaga responded to Plaintiff's July 30, 2012, grievance by noting that Plaintiff refused treatment.  (Doc. No. 84-14 at 8.)

According to Plaintiff's Medication Administration Record, in August 2012, he was administered medication on a daily basis, including Lopressor, hydroclorothiazide, Mevacor, aspirin, Depakene, and Doxycycline.[24] (Doc. No. 84-13 at 2-16.)

On August 17, 2012, Plaintiff submitted an Inmate grievance in which he complained of "a big painful leaking lump" on the side of his head, and a second lump on his neck. (Doc. No. 84-14 at 9.) The next day[25] Plaintiff was examined and the antibiotic Doxycycline was ordered. (Doc. No. 84-11 at 10.)

According to Plaintiff's Medication Administration Record, in September 2012, he was administered medication on a

---

24.  Doxycycline is a tetracycline antibiotic.  Doxycycline, Drugs.com, http://www.drugs.com/doxycycline.html (Last accessed March 3, 2016).

25.  Plaintiff's blood pressure on August 18th was 120/70. (Doc. No. 84-11 at 10.)

daily basis, including Inderal, Lopressor, hydroclorothiazide, Mevacor and aspirin. (Doc. No. 84-13 at 2-16.)

On September 3, 2012, Plaintiff submitted a grievance in which he complained of a lack of Lyrica for fibromyalgia and claimed the lack of Lyrica "substantially limits [his] ability to blend (sic), stand, sleep, walk up n (sic) down steps, etc." (sic)(Doc. No. 84-14 at 10.)  Plaintiff claimed that by being refused Lyrica and being forced to be in an environment of hard surfaces proved "Deliberate Indifference," and that his pain was causing depression. Id.  Plaintiff demanded $1,000.00 for each day he had been refused Lyrica "for cruel & unusual punishment violating [his] 8th amendment right." Id.  Plaintiff's grievance was responded to on September 14, 2012, with a notation that his allegations were false, and that he was receiving all medically necessary treatment.  Id.

On September 9, 2012, Plaintiff submitted a grievance in which he complained that his medication was giving him headaches and that he felt as if he was "crawling out of [his] skin." (Doc. No. 84-14 at 11.)  This grievance was responded to by medical personnel with the notation seen on October 2, 2012, after his prescription for Depakene[26] was discontinued. Id.

---

26. Depakene, generic valproic acid, is a drug used to treat convulsions, migraines and bipolar disorder. Valproic acid, Drugs.com, http://www.drugs.com/mtm/valproic-acid.html (Last
(continued...)

According to Plaintiff's Medication Administration Record, in October 2012, he was administered medication on a daily basis, including Lopressor, hydroclorothiazide, Mevacor and aspirin. (Doc. No. 84-13 at 2-16.)

On October 16, 2012, Plaintiff submitted a grievance in which he requested an answer to a grievance appeal relating to his alleged lack of treatment for fibromyalgia, purportedly so that he could exhaust his administrative remedies and proceed with a § 1983 action. (Doc. No. 84-14 at 12.) The medical department responded on January 9, 2013, that the original grievance of September 7, 2012, was responded to on September 14, 2012, and that no new medical information had been provided which would change the conclusions reached at that time. Id.

According to Plaintiff's Medication Administration Record, in November 2012, he was administered medication on a daily basis, including Lopressor, hydroclorothiazide, Mevacor and aspirin. (Doc. No. 84-13 at 2-16.)

On November 16, 2012, Plaintiff's medication, including hydroclorothiazide, Mevacor and aspirin were reordered. (Doc. No. 84-11 at 10.)

According to Plaintiff's Medication Administration Record, in November 2012, he was administered medication on a

---

26.  (...continued)
accessed March 3, 2016).

daily basis, including Lopressor, hydroclorothiazide, Mevacor and aspirin. (Doc. No. 84-13 at 2-16.)  Plaintiff continued to be administered daily medication through May, 2013. <u>Id.</u>

On May 25, 2013, Plaintiff's medications, including hydroclorothiazide, Mevacor, aspirin and Lopressor were reordered and Plaintiff continued to be administered medication thereafter. (Doc. No. 84-11 at 11.)

Plaintiff has not submitted an expert report in this matter to support his allegations that (1) he suffers from fibromyalgia, (2) he requires the prescription medication Lyrica, or (3) he suffered any injury as a result of the lack of that medication.  Moreover, he has not provided any expert opinion that the medical personnel employed by Corrections Care, Inc., deviated from the appropriate standard of care relating to his treatment.

## IV.  Discussion

Plaintiff is asserting two basic claims: (1) the Corrections Defendants and Medical Defendants violated his Constitutional right, as a pretrial detainee, to adequate medical care, and (2) Defendant Iannuzzi retaliated against him for complaining about the alleged inadequate medical care.

The Corrections Defendants argue in support of their motion for summary judgment that they had no personal involvement in the provision of medical care to Plaintiff and, therefore, cannot be liable.  The Medical Defendants in support of their

27

motion for summary judgment argue that Plaintiff has neither produced evidence to establish that they were deliberately indifferent to a serious medical need nor negligent in providing care.  They also argue that Plaintiff has not presented evidence that any policy or custom was responsible for a constitutional injury and that with respect to Defendant Iannuzzi there is no evidentiary basis for a retaliation claim.

A plaintiff, in order to establish a § 1983 claim, must present evidence from which a jury could reasonably find two essential elements:  1) that the conduct complained of was committed by a person acting under color of state law, and 2) that said conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. Groman v. Township of Manalapan, 47 F.3d 628, 638 (3d Cir. 1995); Shaw by Strain v. Strackhouse, 920 F.2d 1135, 1141-42 (3d Cir. 1990).

Moreover, liability may not be imposed under § 1983 on the traditional standards of respondeat superior.  Capone v. Marinelli, 868 F.2d 102, 106 (3d Cir. 1989) (citing Hampton v. Holmesburg Prison Officials, 546 F.2d 1017, 1082 (3d Cir. 1976)). In Capone, the court noted "that supervisory personnel are only liable for the § 1983 violations of their subordinates if they knew of, participated in or acquiesced in such conduct."  868 F.2d at 106 n.7.

28

As for the inadequate medical care claim, the Defendants have not disputed Plaintiff's claim that he was a pretrial detainee during his confinement at the Lackawanna County Prison. Consequently, the issue of inadequate medical care must be analyzed under the due process clause of the Fourteenth Amendment. Bell v. Wolfish, 441 U.S. 520 (1979); Boring v. Kozakiewicz, 833 F.2d 468, 471 (3d Cir. 1987); Hubbard v. Taylor, 399 F.3d 150, 158 (3d Cir. 2005).  However, penal institutions which house pretrial detainees have a legitimate governmental interest in only providing medical care that is reasonably necessary. See Boring v. Kozakiewicz, 833 F.2d at 473 ("[T]he cost of detention justifies providing no more than a reasonable level of medical care.") (citing Hamm v. DeKalb County, 774 F.2d 1567 (11th Cir. 1985)).

The standard under the Fourteenth Amendment encompasses the Eighth Amendment deliberate indifference standard. Keller v. County of Bucks, 2006 WL 3779749, at *3 (3d Cir. Dec. 22, 2006)(claims by pretrial detainees have parameters that are coextensive with those of the Eighth Amendment's prohibition against cruel and unusual punishment). Under Bell, Boring and Hubbard, the due process inquiry is whether the alleged inadequate medical care amounted to punishment prior to an adjudication of guilt and the condition, objected to by the pretrial detainee, must have no legitimate governmental purpose.  Bell, 441 U.S. at 538.  The Eighth Amendment acts as a floor for the due process

inquiry and is the starting point of the analysis. <u>Montgomery v.</u>
<u>Ray</u>, 145 F. App'x 738, 740 (3d Cir. 2005). Consequently, the court
will first review the requirements for liability under the Eighth
Amendment.

Claims based upon the Cruel and Unusual Punishments
Clause have both subjective and objective components. <u>Wilson v.</u>
<u>Seiter</u>, 501 U.S. 294, 298 (1991) The subjective component is met
if the person or persons causing the deprivation acted with "a
sufficiently culpable state of mind". <u>Id.</u>  Serious hardship to the
prisoner is required to satisfy the Eighth Amendment's objective
component. <u>Id.</u>

With respect to Plaintiff's claim of inadequate medical
treatment, the Eighth Amendment "requires prison officials to
provide basic medical treatment to those whom it has
incarcerated." <u>Rouse v. Plantier</u>, 182 F.3d 192, 197 (3d Cir.
1999). In order to establish a claim under § 1983 based on the
Eighth Amendment, an inmate must present evidence of acts or
omissions by prison officials sufficiently harmful to evidence
deliberate indifference to a serious medical need. <u>See</u> <u>Spruill v.</u>
<u>Gillis</u>, 372 F.3d 218, 235 (3d Cir. 2004); <u>Natale v. Camden Cty.</u>
<u>Correctional Facility</u>, 318 F.3d 575, 582 (3d Cir. 2003). In the
context of medical care, the relevant inquiry is whether the
defendant was: (1) deliberately indifferent (the subjective

30

element) to (2) plaintiff's serious medical needs (the objective element). Farmer v. Brennan, 511 U.S. 825, 834-35 (1994); Monmouth County Correctional Institution Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987); West v. Keve, 571 F.2d 158, 161 (3d Cir. 1979). Because only egregious acts or omissions can violate this standard, mere medical malpractice can not result in an Eighth Amendment violation, nor can disagreements over a prison physician's medical judgment. White v. Napoleon, 897 F.2d 103, 108-10 (3d Cir. 1990).

A complaint that a physician or a medical department "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment..." Estelle v. Gamble, 429 U.S. 97, 106, (1976). "A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice." Id., 429 U.S. at 107. "Allegations of medical malpractice are not sufficient to establish a Constitutional violation." Spruill, 372 F.3d at 235. "[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990). In sum, negligence, unsuccessful medical treatment, or medical malpractice do not give rise to a § 1983 cause of action, and an inmate's disagreement with medical treatment is insufficient to establish

deliberate indifference.  See Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993).

A mere difference of opinion between the prison's medical staff and the inmate regarding the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment.  Farmer v. Carlson, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988).  See McCracken v. Jones, 562 F.2d 22, 24 (10th Cir. 1977); Smart v. Villar, 547 F.2d 112, 113 (10th Cir. 1976).

Additionally, if there is a dispute over the adequacy of the received treatment, courts have consistently been reluctant to second guess the medical judgment of the attending physician. Little v. Lycoming County, 912 F. Supp. 809, 815 (M.D. Pa.), aff'd, 101 F.3d 691 (3d Cir. 1996).  The key question is whether the defendant has provided the plaintiff with some type of treatment, regardless of whether it is what the plaintiff desires. Farmer v. Carlson, 685 F. Supp. at 1339.

The objective component of an Eighth Amendment claim, i.e., whether a plaintiff's medical needs were serious, has its roots in contemporary standards of decency.  Hudson v. McMillian, 503 U.S. 1, 8-9 (1992).  A medical need is serious if it is one that has been diagnosed by a physician as mandating treatment or is one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.  Johnson v. Busby, 953 F.2d 349, 351 (8th Cir. 1991); Monmouth County

Correctional Institution Inmates v. Lanzaro, 834 F.2d at 347;
Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980), cert. denied,
450 U.S. 1041 (1981); West vs. Keve, 571 F.2d at 162-63 n.6.  The
serious medical need element contemplates a condition of urgency,
one that may produce death, degeneration, or extreme pain.  See
Monmouth County Correctional Institution Inmates v. Lanzaro, 834
F.2d at 347; Archer v. Dutcher, 733 F.2d 14, 16-17 (2d Cir. 1984);
Todaro v. Ward, 565 F.2d 48, 52 (2d Cir. 1977).  The Court of
Appeals for the Third Circuit has held that not every injury or
illness enjoys constitutional protection; only serious medical
problems are actionable.  See West v. Keve, 571 F.2d at 161.
Other courts of appeal have indicated that minor abrasions even
involving associated bleeding do not rise to the level of an
objectively serious medical need. See Wisneski v. Denning, 2014 WL
1758118, *22 (W.D.Pa. April 30, 2014) (collecting cases).

Even if the court assumes that Plaintiff's medical need
was serious in the constitutional sense, the summary judgment
record reveals that he received medical attention.  At best, the
summary judgment record demonstrates Plaintiff's mere disagreement
with the scope and extent of treatment by the Medical Defendants.
Plaintiff's disagreement with the course of treatment, however,
does not serve as a predicate to liability. See White v. Napoleon,
897 F.2d at 108-110(No deliberate indifference claim is stated
when a doctor disagrees with the professional judgment of another

33

doctor since "[t]here may, for example, be several acceptable ways to treat an illness."); <u>Inmates of Allegheny County Jail v. Pierce</u>, 612 F.2d at 762(claim for deliberate indifference does not arise just because one doctor disagrees with the diagnosis of another).

When an inmate is provided with medical care and the dispute is over the adequacy of that care, no Eighth Amendment claim exists.  <u>White v. Napoleon</u>, 897 F.2d 103, 108-10 (3d Cir. 1990).  "A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.  At most it is medical malpractice[.]"  <u>Estelle</u>, 429 U.S. at 107.  A mere difference of opinion between the inmate and the prison's medical staff regarding the diagnosis or treatment that the inmate receives does not support a claim of cruel and unusual punishment. <u>See</u> <u>McFadden v. Lehman</u>, 968 F. Supp. 1001, 1004 n.6 (M.D. Pa. 1997); <u>Young v. Quinlan</u>, 960 F.2d 351, 358 n.18 (3d Cir. 1992). The key question is whether the defendant has provided the plaintiff with some type of treatment, despite whether it is what the plaintiff wants. <u>Farmer v. Carlson</u>, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988).

The summary judgment record establishes efforts by the Medical Defendants to provide Plaintiff with necessary medical care, and an attendant mental state that falls short of deliberate

indifference, and no record evidence exists to create a dispute on this issue.

Plaintiff has not established that the medications he was provided with were inadequate to treat his alleged fibromyalgia and musculoskeletal pain.  A mere disagreement by a pretrial detainee regarding the medications he should receive is not a sufficient basis to find that a medical provider was deliberately indifferent or that the medical provider or prison official was acting unreasonably.  Fibromyalgia as stated earlier is a diagnosis of exclusion.  There is no evidence in the record that a rheumatologist excluded all other possible cause of his alleged musculoskeletal pain.  Under the circumstances no jury could reasonably conclude that the declination to provide Lyrica was a violation of Plaintiff's due process rights under the Fourteenth Amendment.

No jury could reasonably conclude that the care provided was unreasonable under the circumstances or that the Defendants did not have a legitimate governmental reason to provide him with a medication other than Lyrica.  Other than his own lay opinion, Plaintiff has failed to present evidence that Lyrica was mandated based on his medical circumstances.  The Corrections and Medical Defendants had a legitimate governmental interest in declining to provide Plaintiff with the drug Lyrica, including that no rheumatologist found that Plaintiff suffered from fibromyalgia and

that Plaintiff had a history of suicide and drug and alcohol abuse
which are contraindications to prescribing Lyrica.

As for Plaintiff's claim of retaliation, the court
discerns no evidence from which a jury could reasonably conclude
that Defendant Iannuzzi retaliated against the Plaintiff because
Plaintiff complained about the medical treatment he was receiving.
Plaintiff vaguely claims the retaliation was as follows: (1)
Defendant Iannuzzi threatened to catheterize him; (2) provided him
with high blood pressure medication; (3) confiscated a splint; and
(4) referred him to a psychiatrist.

To establish a Section 1983 retaliation claim, a
plaintiff bears the burden of satisfying three elements.  First, a
plaintiff must prove that he was engaged in a constitutionally
protected activity.  Rauser v. Horn, 241 F.3d 330, 333 (3rd Cir.
2001).  Second, a prisoner must demonstrate that he "suffered some
'adverse action' at the hands of prison officials."  Id. (quoting
Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000)).  This
requirement is satisfied upon showing that "the action 'was
sufficient to deter a person of ordinary firmness from exercising
his First Amendment rights.'"  Id. (quoting Allah, 229 F.3d at
225). Third, a prisoner must prove that "his constitutionally
protected conduct was 'a substantial or motivating factor' in the
decision to discipline him" or take the adverse action  Id.
(quoting Mount Healthy Bd. of Educ. v. Doyle, 429 U.S. 274, 287

36

(1977).  Once a prisoner demonstrates that his exercise of a
constitutional right was a substantial or motivating factor in the
challenged decision, the prison officials may still prevail by
proving that they would have made the same decision absent the
protected conduct for reasons reasonably related to a legitimate
penological interest.  Id. at 334.

        Plaintiff's retaliation claim fails because there is no
evidence from which a jury could reasonably conclude that
Plaintiff suffered an adverse action.  The medical records suggest
that Plaintiff was being treated for an enlarged prostate, and
that catheterization was addressed in that context.  As for being
prescribed high blood pressure medication, the medical record both
before and during his incarceration, reveal that Plaintiff
suffered from elevated blood pressure and was appropriately
prescribed medication for that condition.  With respect to the
allegations regarding the confiscation of his splint, Plaintiff's
records show that the splint was initially provided on May 30,
2012, and was not ordered to be discontinued until June 20, 2012,
nearly three months after he reported sustaining a fracture.
Also, Plaintiff does not allege or have medical evidence
indicating he suffered any harm from the removal of the splint.
There is also no documentation, in Plaintiff's medical records or
grievances of any complaints regarding the right hand after the
splint was removed, of post-dating his grievance of June 19, 2012.

Finally, although Plaintiff alleges that Defendant Iannuzzi referred him to see a psychiatrist in retaliation for his complaints, Plaintiff's medical records of June 20, 2012, state that Plaintiff was recommended to undergo a psychiatric consultation to help decrease stress which might worsen his purported fibromyalgia.  Furthermore, Plaintiff's grievance of July 19, 2012, suggests it was Dr. Zolaga, rather than Iannuzzi who referred Plaintiff for the psychiatric consultation, and Plaintiff has not alleged or presented evidence that any harm resulted from the consultation.  Consequently, summary judgment will be granted in favor of Defendant Iannuzzi with respect to Plaintiff's retaliation claim.

With respect to the Corrections Defendants - McMillan and Betti – the court discerns no evidence from which a jury could reasonably find that they were involved in any conduct which violated Plaintiff's constitutional rights.  Their only involvement, if any, was with respect to the handling of Plaintiff's grievances and appeals relating thereto.  Such involvement is insufficient as a matter of law to render those defendants liable.  "[T]he failure of a prison official to act favorably on an inmate's grievance is not itself a constitutional violation."  Rauso v. Vaughn, Civil No. 96-6977, 2000 WL 873285, at *16 (E.D.Pa., June 26, 2000). See also Overholt v. Unibase Data Entry, Inc., 221 F.3d 1335 (Table), 2000 WL 799760, at *3 (6th

Cir.2000) ("The defendants were not obligated to 'properly'
respond to Overholt's grievances because there is no inherent
constitutional right to an effective prison grievance procedure.
Hence, his allegations that the defendants did not properly
respond to his grievances simply do not rise to the level of a
constitutional violation.") (citations omitted); Mitchell v.
Keane, 974 F.Supp. 332, 343 (S.D.N.Y.1997) ("it appears from the
submissions before the court that Mitchell filed grievances, had
them referred to a prison official, and received a letter
reporting that there was no evidence to substantiate his
complaints. Mitchell's dissatisfaction with this response does not
constitute a cause of action."); Caldwell v. Beard, Civil No.
2:07-CV-727, 2008 WL 2887810, at *4 (W.D.Pa. July 23, 2008) ("Such
a premise for liability [i.e., for performing a role in the
grievance process] fails as a matter of law."), aff'd,---
Fed.Appx. ----, 2009 WL 1111545 (3d Cir. April 27, 2009); Caldwell
v. Hall, Civil No. 97-8069, 2000 WL 343229, at *2 (E.D.Pa. March
31, 2000) ("The failure of a prison official to act favorably on
an inmate's grievance is not itself a constitutional violation.");
Orrs v. Comings, Civil No. 92-6442, 1993 WL 418361, at *2 (E.D.Pa.
Oct.13, 1993) ("But an allegation that a defendant failed to act
on a grievance or complaint does not state a Section 1983
claim."); Jefferson v. Wolfe, Civil No. 04-44, 2006 WL 1947721, at
*17 (W.D. Pa. July 11, 2006) ("These allegations [of denying

39

grievances or grievance appeals] are insufficient to establish such Defendants' personal involvement in the challenged conduct under Section 1983. See Watkins v. Horn, 1997 WL 566080 at * 4 (E.D.Pa..[sic] 1997) (concurrence in an administrative appeal process is not sufficient to establish personal involvement)").

Consequently, summary judgment will be granted in favor of McMillan and Betti and against Plaintiff.

An appropriate order will be entered.